**UNITED STATES of America**

v.

**$69,530.00 IN UNITED STATES CURRENCY.**

No. P–97–CA–004.

United States District Court,
W.D. Texas,
Pecos Division.

June 11, 1998.

David R. Rosado, Assistant U.S. Attorney, El Paso, TX, for the Government.

H. Thomas Hirsch, Hirsch, Stroder & Hobbs, Odessa, TX, for Claimant Daniel Ify Iwegbu.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FURGESON, District Judge.

This is a civil forfeiture proceeding brought by the Government pursuant to 21 U.S.C. § 881(a)(6) and 31 U.S.C. §§ 5316 and 5317. The Government seeks forfeiture of $69,530.00 seized from Daniel Ify Iwegbu (Claimant) on January 31, 1992.[1] A bench trial was conducted in this matter on Friday, March 13, 1998. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now enters its Findings of Facts and Conclusions of Law.

### FINDINGS OF FACT

*The Seizure*[2]

On January 31, 1992, Daniel Ify Iwegbu (Claimant) was traveling eastbound in a

Greyhound bus from Los Angeles, California, to Dallas, Texas. The bus was stopped at the Border Patrol's permanent checkpoint in Sierra Blanca, Texas, about 90 miles east of El Paso. During the stop, Border Patrol Agent Jorge Reza conducted an immigration inspection, walking from the front to the back and ascertaining the citizenship status of each passenger. Claimant told Agent Reza that he was a citizen of the United States. Noting his accent, Agent Reza asked Claimant's citizenship a second time. Agent Reza testified that he asked Claimant where he was born but he was unable to give a birthplace.

Agent Reza proceeded with the inspection of the rest of the bus passengers and then returned to Claimant. Upon the Agent's queries, Claimant stated that he was born in London, that he was a permanent resident living in the United States, and that he had misplaced his resident alien card and his passport. Agent Reza asked him to get off the bus and to bring with him any luggage he had. Claimant got off the bus with a black, tweed foldover carry-on bag; a black, hard-shelled suitcase belonging to Claimant was also removed from the lower luggage area of the bus.

Claimant was detained at that time. Although he was ultimately released, $69,530.00 in his possession was seized and has not been returned to him. Claimant testified that the money was sent to him by his father Francis Iwegbu, who has since died, so that he could purchase a used Mercedes Benz automobile to be transported to Nigeria. Claimant states that he attempted to purchase a vehicle in California but was unsuccessful and was returning to Dallas, Texas, when he was detained at Sierra Blanca.

*The Arrest*

Claimant was arrested on March 3, 1992, in Dallas, Texas on charges that he alleges

1. Claimant's verified claim alleges that the amount seized was $69,580.00. The Court accepts as true the Government's statement that the amount in question is $69,530.00.

2. By order of the Court dated August 18, 1997 (hereinafter referred to as the "August 18 Suppression Order"), the Government is prohibited from introducing any evidence tainted by violations of Claimant's Fourth Amendment rights on

January 31, 1992. However, the Court's August 18 Suppression Order did not suppress relevant evidence adduced *prior* to the violations of Claimant's Constitutional rights. Therefore, the fact of the seizure as well as any relevant events occurring on January 31, 1992, prior to the Fourth Amendment violations are proper for the Court to consider at this time.

are unrelated to his claim for the seized property. Because the Court finds that the arrest has a bearing on Claimant's claim to the money, the Court now details the circumstances surrounding his arrest.

Pamela Gail Jones Knight testified before the Court that she was a courier for Claimant, whom she knew as "Oscar." She testified that in the summer of 1991, Claimant approached her at a friend's house and asked her if she knew anyone who, for $8,000, would make a trip to Switzerland and then to Canada, and then back into the United States carrying diamonds. She was subsequently told that, if she accepted, she would be transporting cocaine, not diamonds.

In late December of 1991, Knight contacted Claimant and discussed making the trip. She learned that she would in fact be transporting heroin. Knight testified as to the particulars of her travels for Claimant; with her friend Veronica Baker and Claimant, she traveled from Dallas/Fort Worth to Los Angeles to meet some of his contacts. In Los Angeles, they discovered that they would not be traveling to Switzerland. Knight and Baker left Claimant in Los Angeles and went to Bangkok, Thailand, with one of the contacts, "Kenny."

Traveling separately and on separate days, Baker and Knight each carried a suitcase from Thailand to Geneva, Switzerland. In Geneva, Knight and Baker relinquished their suitcases to Cindy Holcomb and Melissa Martin, respectively. Holcomb and Martin transported the suitcases from Geneva to Canada and then into the United States. Knight and Baker returned to the United States via London in early January of 1992.

Knight was not paid for her trip until February 7, 1992. On that day she went with Claimant to a Western Union outlet, where she obtained $6,000. Less $1,500 that she gave to him, she earned $4,500 for her trip. Claimant explained that the reason Knight was not paid on time was because of an incident on the bus he was riding during his return trip from Los Angeles to Dallas. As the bus entered a checkpoint in El Paso, customs agents boarded and asked for his immigration papers. Claimant told Knight that he was arrested for immigration prob-

lems and that the $40,000 that he was carrying on the bus with him was seized by the officers who arrested him.

Knight testified that upon the encouragement of family members, she went to the Drug Enforcement Agency (DEA) in late January or early February, 1992, and reported what she had done. Although the DEA made her no promises, they asked for her assistance in getting agents into the organization for which she had transported narcotics. During the next few months, the DEA paid Knight over $6,000 to enable her to assist in their investigation.

During a February 7, 1992, conversation, Claimant asked her to help him find additional couriers. Knight used this query as an opportunity to introduce federal agents to Claimant. On February 24, 1992, Knight spoke to Claimant on the telephone and suggested her friends "Rick Henderson" and his girlfriend as potential couriers. On March 2, 1992, Knight again spoke to Claimant, and Claimant indicated that he would like to use Rick Henderson only. Rick Henderson was in fact Mike Hoskins, a Dallas police officer and DEA drug task force agent. Claimant called Hoskins that day, identifying himself as Oscar. Claimant offered Hoskins $5,000 to make a trip to Sofia, Bulgaria and bring a suitcase back for him. Hoskins was to fly to New York City first. In New York, Claimant's contacts were to meet him and provide him with further instructions as well as airline tickets to travel on to Sofia, Bulgaria. Claimant asked Hoskins to leave immediately but Hoskins was able to put him off for a few days.

Claimant agreed to meet Knight and Officer Hoskins at Danal's Grocery Store on March 3. The three chose Danal's Grocery because Claimant needed to go to a place that had a Western Union office, to get money that was being wired to him. The meeting between Knight, Officer Hoskins and Claimant occurred at about 1:20 p.m. and was being recorded; a transmitter was on the person of Agent Hoskins. Knight drove to the grocery store, with Claimant in the passenger seat. Officer Hoskins observed the two of the them go into the store. Officer

Hoskins exited his vehicle and walked toward the store, meeting Claimant and Knight at the entrance. The three of them went back to Officer Hoskins's truck so that they could talk. Claimant gave the officer a Continental Airlines ticket in the name of Jay Harrison to fly from Dallas/Fort Worth to Houston and continuing to New York City. Officer Hoskins asked if he could have a portion of the product instead of getting paid in cash. Claimant told Officer Hoskins that "this is not cocaine—this is pure heroin … it's not like you can go out and smoke it like you can cocaine." Claimant also suggested that, possibly after a second trip, sharing in the product might be feasible.

Claimant provided Officer Hoskins with detailed instructions on what to do in New York City and how to conduct himself in Sofia, Bulgaria. In connection with obtaining travel money, Claimant gave Officer Hoskins a name and a telephone number of the individual who was supposed to wire the money from New York that was to be picked up at the Western Union office. The computer in the Western Union office at Danal's was down, so the three of them drove six blocks to an alternate Western Union. Officer Hoskins obtained $150.00 in travel money and the three returned to Danal's. Officer Hoskins left the parking lot and gave an arrest signal to the surveillance team that was watching and recording the meeting. Claimant and Knight were arrested; Knight was arrested so that her undercover status would not be revealed. Special Agent Tim Stover of the DEA, who witnessed the arrests, recalled that an officer at the scene read Claimant and Knight their *Miranda* warnings, although he does not recall which officer did so.

Knight also recalls being read her rights at the time of her arrest. She was taken in a separate car to the DEA office to be fingerprinted and photographed. She was not detained or debriefed; someone from DEA took her back to her car at Danal's and she went home.

### The Confession

Two members of the surveillance team that eventually arrested Claimant were Special Agent Stover of the DEA and Special Agent David Hegmann of the United States Customs Service. After his arrest, Claimant was transported to the DEA office in Dallas, where he was interrogated for about an hour. Agent Stover handled the interrogation. Both Agent Hegmann and Officer Hoskins were present from time to time during the interrogation. Before beginning the interview, Agent Stover read Claimant his *Miranda* warnings, including his rights to remain silent and to have a lawyer present with him prior to any questioning. Agent Stover testified that Claimant understood his rights and was willing to talk to law enforcement officials. The agents testified that Claimant was not coerced, threatened, or promised leniency to induce him to answer questions. The interrogation was not recorded.

Agent Stover testified that Claimant was not informed that he had a right to contact the Nigerian consulate, and further, that he was not aware that he was even obligated to allow him to speak to the Nigerian consulate. It was the usual practice of the DEA, however, to notify a foreign consulate if it arrested a foreign national such as Claimant. In this case, Agent Stover testified that he notified the Nigerian consulate via facsimile when Claimant was arrested, but that no one from the Consulate ever contacted Dallas law enforcement officers on Claimant's behalf.

During this interrogation, Claimant described to the Agents how he became involved in heroin smuggling. He told them that he became involved in the recruitment of heroin smugglers through a friend named Manuel, whom the agents were able to identify as a cab driver in Dallas named Emmanuel. Manuel introduced Claimant to "Emeka," from Los Angeles—Claimant later was able to identify Emeka as Kenny Evans. Evans asked Claimant to recruit females to make the trips, and Claimant recruited Knight and Baker to travel to Bangkok for the purpose of transporting heroin to Switzerland and then ultimately to the United States.

Claimant admitted to traveling to Los Angeles on the same flight as Knight and Baker. When they arrived in Los Angeles, Claimant met "Musa" and a Nigerian named Jeff or Jeffery who controlled the whole or-

ganization. After Knight and Baker departed for Bangkok, Claimant stayed in Los Angeles for a few weeks. He stated that he returned to Texas by bus with $70,000 in tens and twenties that he received from Musa and Jeff to pay himself and the couriers. On the way, he was stopped by U.S. Border Patrol Agents at Sierra Blanca, Texas; the money was seized and he was arrested. Claimant told the Agents that he was to pay Knight and Baker $10,000 each, that $15,000 was for miscellaneous expenses, and that $35,000 was for himself as his pay for recruiting the couriers.

Claimant told the agents that he contacted Musa and Jeff after his release at Sierra Blanca and told them about the seizure of the money. He was informed that he would not be compensated, but that $4,500 apiece was to be wired to Knight and Baker. Claimant also said that he was to be paid $2,000 for recruiting Hoskins, and Hoskins was to be paid $10,000.

With respect to the Sierra Blanca seizure, Agent Stover testified that Claimant "was very forthcoming. He gave us a narrative. I don't recall who brought up what." Agent Stover also testified that he was not aware of Claimant's arrest or the seizure of money in Sierra Blanca prior to Claimant's interrogation. Agent Hegmann also testified that he was not aware, prior to Claimant's arrest, that Claimant was Nigerian, or that he had been arrested in Sierra Blanca. He testified that the Border Patrol is a separate entity from the Customs Service, and he only became aware of the $70,000 when Claimant provided the agents with the information.

Claimant disputes that the agents were not aware of the incident at Sierra Blanca or the resulting seizure and arrest. He testified that he did not know what was happening, that he could not recall what he said, and that the Agents lied when they denied coercing statements from him.

## CONCLUSIONS OF LAW

■ Title 21 U.S.C. § 881 subjects to forfeiture "all moneys used or intended to be used to facilitate any violation of this subchapter." 21 U.S.C. § 881. "The government has the initial burden 'to show probable cause for belief that a substantial connection exists between the property to be forfeited and a crime under Title 21.'" *U.S. v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 331 (5th Cir.1990) (quoting *U.S. v. $64,000.00 in United States Currency*, 722 F.2d 239, 244 (5th Cir.1984)). Probable cause established after the seizure can also be used to prove the Government's right to forfeiture. *See U.S. v. "Monkey"*, 725 F.2d 1007, 1011 (5th Cir.1984).

■ The Fifth Circuit has defined "probable cause" as "reasonable ground for guilt, supported by less than prima facie proof but more than mere suspicion." *U.S. v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980). The government is obligated to articulate probable cause of a specific violation of Title 21; "[p]robable cause to believe the property is related to 'some' illegal activity does not permit forfeiture." *U.S. v. Forfeiture Stop Six Center*, 781 F.Supp. 1200, 1204 (N.D.Tex.1991) (citing *U.S. v. $38,600.00 in United States Currency*, 784 F.2d 694, 698–99 (5th Cir.1986)). Additionally, "probable cause can be established by circumstantial or hearsay evidence." *One 1987 Mercedes 560 SEL*, 919 F.2d at 331.

■ The Government has met its burden. The Court finds probable cause for the belief that a substantial connection exists between Claimant's $69,530.00 and his heroin smuggling activities in violation of Title 21. The Court's finding of probable cause is based specifically on statements that Claimant made to Pamela Gail Jones Knight, DEA Agent Tim Stover, and Special Agent David Hegmann.

Claimant told Ms. Knight that the reason he did not pay her on time was because his payment funds were confiscated while en route to Dallas from Los Angeles. Claimant told Agents Stover and Hegmann that, following his trip to Los Angeles, he returned to Texas with $70,000 to pay the couriers. He told the agents that he was to pay Ms. Knight and Ms. Baker $10,000 each, that $15,000 was for miscellaneous expenses, and that $35,000 was for himself as his pay for recruiting the couriers. Finally, he told the

**592**

agents that the money was seized by Border Patrol Agents in Sierra Blanca, Texas.

Claimant disputes the testimony of the agents, who he claims already knew about the money by the time Claimant was arrested in Dallas. Claimant further alleges that he did not waive his *Miranda* rights and that his statements were coerced. However, the Court finds the Agents' testimony to be highly credible, particularly in light of the fact that Knight was able to independently corroborate key elements of their testimony. Knight corroborated portions of Claimant's statement to the Agents that related to events preceding the seizure. For example, Knight's testimony confirmed that Claimant's presence in Los Angeles during the relevant time was smuggling-related, and was further able to confirm Claimant's relationship with Kenny Evans. Knight also corroborated the fact that Claimant was bringing money from Los Angeles to Dallas to pay his couriers. In sum, these statements made by Claimant, and their independent corroboration by Ms. Knight, establish probable cause that the money in question was connected to Claimant's heroin smuggling activities in violation of Title 21.

■ Claimant also contends that this Court's August 18 Suppression Order prevents the Government from making *any* mention that the money was seized at the Sierra Blanca checkpoint.

The Court's August 18 Suppression Order was intended to suppress all evidence tainted by the violation of Claimant's Fourth Amendment rights on January 31, 1992. The Court notes that Claimant himself offered evidence that the money was seized from his person while he was detained at Sierra Blanca. More importantly, the statements made to the agents and to Ms. Knight bore no connection to the violation of Claimant's Fourth Amendment rights on January 31, 1992, and therefore need not be excluded from evidence under the August 18 Suppression Order. *See U.S. v. Hamilton,* 931 F.2d 1046, 1053 (5th Cir.1991); *see also U.S. v. One 1979 Mercury Cougar XR-7,* 666 F.2d 228, 229 (5th Cir.1982). The Court's August 18 Suppression Order suppressed evidence of the circumstances surrounding the seizure, but it

did not—and could not—suppress the fact of the seizure itself. *See "Monkey",* 725 F.2d at 1012; *accord U.S. v. One 1978 Mercedes Benz 4–Door Sedan,* 711 F.2d 1297 (5th Cir. 1983).

■ Because the Court finds probable cause that the seized funds were used to further violations of Title 21, Claimant now bears the burden to show by a preponderance of the evidence that the money in question was obtained from a legitimate, non-drug related source. *See U.S. v.1988 Oldsmobile Supreme,* 983 F.2d 670, 674 (5th Cir. 1993); *U.S. v. One 1980 Rolls Royce,* 905 F.2d 89, 90 (5th Cir.1990); *U.S. v. One 1986 Nissan Maxima GL,* 895 F.2d 1063, 1065 (5th Cir.1990). Claimant contends that his father Francis Iwegbu gave him the cash to purchase a used Mercedes Benz vehicle to be transported to Nigeria. Claimant, however, offers no evidence other than his own testimony to prove his contention. The Court finds that Claimant's testimony, by itself, fails to establish by a preponderance of the evidence that the funds seized from him were not related to his heroin smuggling activities. *See U.S. v.1988 Chevrolet Silverado,* 16 F.3d 660, 665 (5th Cir.1994).

## CONCLUSION

The Court finds that the $69,530.00 in United States currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

Accordingly,

It is **ORDERED** that the Government's request for civil forfeiture of the $69,530.00 in United States Currency be **GRANTED**.